

**SO ORDERED.**

**SIGNED this 15 day of May, 2007.**

_____
JANICE MILLER KARLIN
UNITED STATES BANKRUPTCY JUDGE

_____

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

IN RE:

**STEPHANIE KAY LANNING,**

     **Debtor.**

_____

    **Case No. 06-41037**

    **Chapter 13**

IN RE:

**JESUS MARCARIO AVILA,**

     **Debtor.**

_____

    **Case No. 06-41260**

    **Chapter 13**

## MEMORANDUM AND OPINION SUSTAINING
## TRUSTEE'S OBJECTION TO CONFIRMATION

   The Chapter 13 Trustee has objected to confirmation of the plans in these two

cases.[1]  In each case, the Debtor's actual income is considerably less than his or her

---

   [1]The objection in Lanning is Doc. 34; the objection in Avila is Doc. 14.  Debtor Lanning also filed a Motion to Determine that Chapter 13 Statement of Current Monthly Income and Disposable Income (Form B22C) Does not Determine Plan Payment (Doc. 21), which motion is, essentially, granted by this order, under the terms set out herein.

historical income as a result of changes in employment that occurred in the six-month period prior to filing. The Court must interpret certain provisions of the Bankruptcy Code, as recently amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA),[2] to decide whether the income shown on Form B22C is determinative, or whether circumstances exist under which the Court may use Schedule I to determine such debtors' projected disposable income. The Court must also determine over how many months an above-median income debtor must pay his or her creditors under the facts of these cases.

The Court has jurisdiction to decide these issues pursuant to 28 U.S.C. 157(b)(1) and §§ 1334(a) and (b). Confirmation of a plan is a core proceeding that this Court may hear and determine pursuant to 28 U.S.C. § 157(b)(2)(L).

### Summary of Decision

The Court adopts the majority approach that the net income number obtained from Form B22C is the debtor's "projected disposable income" unless the debtor can show that there has been a substantial change in circumstances such the numbers contained in that form are not commensurate with a fair projection of the debtor's income in the future. On the expense side, above-median income debtors must deduct from income the expenses they itemize on Form B22C to arrive at the minimum amount that they must pay to

---

[2]These cases were filed after October 17, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 become effective. Pub. L. 109-8. All future statutory references are thus to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 11 U.S.C. §§ 101 - 1532 (2005), unless other specifically noted. Any reference to the Bankruptcy Code as it existed prior to the 2005 amendments will be referred to as 11 U.S.C. § ___ (2004) or to Pre-BAPCPA § ___.

2

unsecured creditors, except for limited exceptions not expressly argued here. The Court

further holds that above-median income debtors must make payments for five years,

unless unsecured creditors will earlier be paid in full.

I.    **Facts**

    **A.    Lanning**

        Debtor, Stephanie Lanning, and the Trustee have agreed to submit the issues based

on stipulated facts, which the Court summarizes. Debtor filed her bankruptcy petition on

October 26, 2006. Her Statement of Financial Affairs reflected income of $43,147 in

2004, and $56,516 in 2005, both of which put her above the median family income for a

family of one in Kansas. Within the six months prior to filing, however, she took a

buyout from her then employer, which caused her April 2006 gross income to total

$11,990.03, and her May 2006 gross income to total $15,356.42—over three times her

previous regular monthly income. Because of this buyout, her "current monthly income,"

(hereafter "CMI") as defined by 11 U.S.C. § 101(10A), was skewed upwards to $64,124

per annum, or $5,343 a month.

        In reality, at the time of filing, Debtor was no longer employed by the employer

from whom she had earned the above-median income wages. Debtor's Schedule I

reflects net monthly income of $1,922, which, annualized, equals $23,064—considerably

below the median income in Kansas.[3] Debtor's Schedule J reflects expenses of

_____

    [3]The median income for a family of one in Kansas is $36,631.00, according to the U.S. Census Bureau, Housing
and Household Economic Statistics Division.

Case 06-41037    Doc# 42-1    Filed 05/15/07    Page 3 of 22

$1,772.97. A comparison of those two Schedules thus showed $149 excess income. Debtor's plan proposes to pay $144 per month for 36 months.

In contrast, through use of the expense deductions now required of above-median income debtors, Debtor's Form B22C reflects monthly expenses of $4,228. After subtracting Debtor's monthly expenses from her CMI, Line 58 of Form B22C indicates Debtor has "Monthly Disposable Income Under §1325(b)(2)" of $1,114 to pay to unsecured creditors.[4] Obviously, because Debtor's income precipitously dropped since the six month look-back period, Debtor is unable to pay $1,114 per month to the Trustee, which amount represents almost 60% of Debtor's actual gross monthly income.

Although the Trustee acknowledges that Debtor would be unable to cash flow a plan at the $1,114 rate, that Debtor can only afford to pay the amount her plan proposes to pay, and makes no argument that her reduction in income occurred in bad faith, the Trustee nevertheless filed an objection to confirmation[5] solely on the basis that "[t]he Plan fails to provide that all of the Debtor's projected disposable income to be received in the applicable commitment period will be applied to make payments to unsecured creditors under the plan as required by 11 U.S.C. § 1325." In his brief, he argues that "... 1325(b)(2) and Form B22C provide a rigid, mechanical test by which a debtor's projected disposable income is to be determined, despite the potential for a different result under an

---

[4]The Trustee calculates that a payment of $756 each month, for 60 months, would pay her creditors in full.

[5]Doc. 15.

4

'I minus J' analysis."[6]

**B.     Avila**

Debtor, Jesus Avila, and the Trustee have also agreed to submit the issues under stipulated facts.  Debtor filed his bankruptcy petition on December 8, 2006.  Debtor's Form B22C shows that he is also an above-median income debtor based on the § 101(10A) definition of current monthly income.  During the six-month look back period, Debtor held one full time and two part time jobs, resulting in CMI of $5,686.  At the time of filing, however, he had quit his two part time jobs because of the stress created by working over 14 hours a day.[7]  His "actual" income, as shown on Schedule I, was $5,200, which is still above-median income.

Debtor's Form B22C reflected expenses of $5,531.57, resulting in $155.09 monthly disposable income on Line 58.  The expenses Debtor listed on Schedule J, however, totaled $3,489, leaving net excess disposable income of $411, after deducting those expenses from the actual income shown on Schedule I.  Debtor's plan proposes payment of $195 two times a month, the exact amount of "excess income" noted on Schedule J, which is $256 per month more than the "rigid, mechanical test" advocated by the Trustee.  Since creditors will receive more under Debtor's plan than that mechanical

---

[6]Doc. 32.

[7]In fact, the Court was advised at the confirmation hearing held April 26, 2007 that Debtor Avila had just died. Debtor's counsel said he had not been able to discuss whether Debtor's heirs might wish to complete his bankruptcy, which is possible under Fed. R. Bankr. P. 1016, but indicated a decision by the Court on these pending issues would assist him in advising Debtor's heirs whether completion would be in their best interest.  Accordingly, the Court announced its decision orally on April 26, 2007, and indicated this written decision would follow.

5

test would require, the Trustee obviously does not object to the higher amount.

Although Debtor's plan provides that the "commitment period is 60 months," it also provides that "[t]he commitment period does not deal with the length of the plan. In so providing, Debtor does not commit to making payments for a full 60 months, or to payment of unsecured creditors." The Trustee's objection states that "Debtor does not propose to pay the net result of Form B22C to unsecured creditors. Trustee contends that changes in circumstances cannot modify this result as Congress' intent was to remove from the Court, Trustee and Counsel the discretion to effect a number at odds with these computations."

The Trustee's position is that 11 U.S.C. § 1325(b)(3) requires, for above-median income debtors, that the court look only at the dollar amount contained on Line 58 of Form B22C, and if it is a positive number, that the debtor must then pay that amount to unsecured creditors over not less than 60 months. As in Lanning, the Trustee does not dispute that Debtor can only afford to pay the amount his plan proposes to pay, or allege that the reduction in income occurred in bad faith.

## II.    Discussion

In its passage of BAPCPA, Congress clearly intended that debtors with the financial ability to pay something to unsecured creditors should be required to do so.[8] To implement this goal, debtors wishing to liquidate their assets under Chapter 7 are now

---

[8]The means test was intended to "ensure that those who can afford to repay some portion of their unsecured debts [be] required to do so." 151 Cong. Rec. S2462-02 (March 10, 2005).

6

subject to a "means test."[9] National and regional expense standards used by the Internal

Revenue Service in determining a taxpayer's ability to repay delinquent taxes[10] are used

to determine whether debtors have the ability to repay a portion of their debts.  If it is

determined, pursuant to § 707(b)(2)(A)(I), that a debtor can pay the stated percentage or

amount of his or her debt, the debtor must choose to either convert his or her case, or

suffer its dismissal.  The means test is incorporated into Chapter 13 proceedings to

determine what amount a debtor must pay to unsecured creditors, and over what period of

time.[11]

### A.    The Statutory Predicate (and Predicament)[12]

To answer the questions raised by these two cases, the Court is required to follow

the plain meaning of the relevant statutes,[13] unless to do so would lead to an absurd or

---

[9]11 U.S.C. § 707(b).

[10]"Collection Financial Standards" used by Revenue Agents in assessing Offers in Compromise can be found at www..irs.gov/businesses/small/article/0,,id=104627,00.html. The National Standards reflect amounts that IRS has deemed reasonable in the five categories of food, housekeeping supplies, apparel and services, personal care products and services, and miscellaneous expenses.  IRS' Local Standards apply to transportation and housing costs (including utility expenses), which vary more by region than the prior five expense areas.  All standards except miscellaneous are derived from the Bureau of Labor Statistics (BLS) Consumer Expenditure Survey (CES). The miscellaneous standard has been established by the IRS.

[11]Section 1325(b)(1)(B).

[12]This is the name that the Bankruptcy Appellate Panel for the First Circuit aptly titled its section analyzing the pertinent law.  *In re Kibbe*, __ B.R. __, 2007 WL 512753 at *2 (1st Cir. BAP 2007) (holding that Congress intended the term "projected disposable income" for below-median income debtors to be forward-looking and reality-based, not grounded in blind adherence to any artificial formulation).

[13]*Lamie v. U.S. Trustee,* 540 U.S. 526, 534 (2004) (When the language of a statute is plain, the sole function of the courts is to enforce the statute according to its terms unless the disposition required by the text is absurd); *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989) (finding that where ... the statute's language is plain, the sole function of the courts is to enforce it according to its terms.") (internal quotation marks and citation omitted)

7

Case 06-41037    Doc# 42-1    Filed 05/15/07    Page 7 of 22

futile result.[14]  The Court must consider the statute as a whole, interpreting it in a fashion that the entire Code can function in a workable manner.[15]  Pivotal to this Court's decision is how to interpret the undefined phrase "projected disposable income" found in § 1325(b)(1)(B), which implicates several sections of the recently amended Bankruptcy Code.

The sections that must be considered are § 101(10A) and §§ 1325(b)(1)- 1325(b)(4). Section 1325(b)(1)(B) is the starting point for this analysis; it provides

> If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan--
>> (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

Although the term "projected disposable income" is not defined, "disposable income" is

defined, as follows:

> For purposes of this subsection, "disposable income" means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended
>
>> (A)(I) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after

---

[14]*Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 575 (1982); *Perry v. Commerce Loan Co.*, 383 U.S. 392 (1966) (finding that when the plain meaning "has led to absurd or futile results" courts have reasonably followed the purpose, rather than the literal words), quoting *United States v. American Trucking Ass'ns*., 310 U.S. 534, 543 (1940).

[15]*See United States v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 371 (1988) (noting that statutory construction is a "holistic endeavor.")

Case 06-41037    Doc# 42-1    Filed 05/15/07    Page 8 of 22

the date the petition is filed; and

(ii) for charitable contributions (that meet the definition of 'charitable contribution' under section 548(d)(3) to a qualified religious or charitable entity or organization (as defined in section 548(d)(4)) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.[16]

This statute then requires us to look at the definition of "current monthly income," which is defined, in §101(10A), as essentially "... the average monthly income from all sources that the debtor receives ... during the 6-month period..." before filing.  In other words, "current monthly income" is a snapshot of a debtor's income for the six-month period prior to the filing of his or her bankruptcy petition; it is not the actual, monthly income the debtor has available to fund a Chapter 13 plan when the bankruptcy is filed.

Subsection 1325(b)(3) is also relevant to this analysis, because it defines what amounts are "reasonably necessary to be expended"—i.e., what expenses are appropriate for an above-median debtor, under §1325(b)(2).  It provides that appropriate expenses shall be determined in accordance with § 707(b)(2)(A) and (B), which limits expenses to the categories and amounts specified therein.  The expenses allowed are those contained in the National and Local Standards established by the Internal Revenue Service, as well as some actual expenses in the categories specified by the Internal Revenue Service as

---

[16]Section 1325(b)(2).

9

"Other Necessary Expenses."

Finally, § 1325(b)(4) defines "applicable commitment period" as three years, or not less than five years for an above-median debtor, unless all allowed unsecured creditors are paid in full earlier.

### 1. Income

In construing these code sections together to determine how to calculate "projected disposable income" for above-median debtors, most courts have focused on whether the undefined term, "projected disposable income," has the same meaning as the defined term, "disposable income."[17]  In other words, did Congress mean the word "projected" to add anything to its definition of "disposable income?"  Two competing interpretations have emerged, and interestingly, both claim their opposite conclusions are supported by the plain meaning of the relevant statutes.

The first camp reasons that the addition of the word "projected" to the defined phrase "disposable income" "suggests that Congress intended to refer to the income actually to be received by the debtor during the commitment period, rather than the income received during the six-month look back period prior to filing.[18]  Courts adopting

---

[17]*In re Edmondson*, __ B.R. __, 2007 WL 656457 (Bankr. D. N.M. 2007), citing *In re Teixeira*, 358 B.R. 484 (Bankr. D. N.H. 2006) ("The issue before the Court is whether the 'disposable income' figure resulting from section 1325(b)(2)'s formula is also the Debtor's 'projected disposable income' that she is required to pay under section 1325(b)(1)(B)."); *In re Slusher*, 359 B.R. 290 (Bankr. D. Nev. 2007) (same).

[18]*See e.g., In re Jass*, 340 B.R. 411 (Bankr. D. Utah 2006) and *In re Hardacre*, 338 B.R. 718 (Bankr. N.D. Tex. 2006) (finding that term "projected disposable income" must be based on anticipated income during plan, not merely average of pre-petition income, otherwise, a debtor could time the filing and change the distribution to creditors).  *See also In re Pak*, 357 B.R. 549 (Bankr. N.D. Cal. 2006) ("In determining whether a plan provides all of the debtor's 'projected monthly income,' a court should attempt to predict what the debtor's disposable income during the term of the plan will be, using the definition of 'current monthly income' set forth in 11 U.S.C. § 101(10A)"); *In re Casey*, 356 B.R.

10

this view opine that it is appropriate for courts to consider each debtors' actual income, as shown on Schedule I, to determine what they can realistically pay over the life of a plan when there has been a substantial change in circumstances that Form B22C could not, or did not, contemplate. These courts also rely on the maxim of statutory construction that when Congress includes particular language in one section of a statute, but omits it in another, Congress must have intended different meanings.[19] Thus, they argue that "projected disposable income" was intended to mean something different than "disposable income."

The other camp holds that Congress intended to, and did, adopt a specific test to be rigidly applied for above-median income debtors, that the test is codified by completion of Form B22C, and that debtors, trustees, and the Court are bound by the mathematical calculations resulting from completion of Form B22C in formulating any plan, regardless

---

519 (Bankr. E.D. Wash. 2006) ("the word 'projected' ... requires a court to examine anticipated disposable income rather than historical disposable income, estimated disposable income, or some other type of disposable income"); *In re Bossie,* 2006 WL 3703203 at *2 (Bankr. D. Alaska 2006) (court refused to confirm plan "because, at [that] time, there [was] insufficient evidence to calculate [the debtors'] anticipated or projected disposable income" and required the debtors to "present specific evidence to show that the numbers reflected on form [B]22C are inaccurate projections of their future finances"); *In re Kibbe,* 2007 WL 512753 at *5 (holding that [one] ... camp "provides a critical meaning to the term "projected" which the former would dwarf."); *In re Grady*, 343 B.R. 747 (Bankr. N.D. Ga.2006) (holding in case where debtor's income had precipitously dropped because he could not work due to a heart problem, that "projected disposable income" means something different than "disposable income."); *In re Watson*, __ B.R.__, 2007 WL 1086582 (Bankr. D. Md. 2007) (following *Jass,* and holding that with admissible evidence, a party may demonstrate "a substantial change in circumstance such that the numbers contained in Form B22C are not commensurate with a fair projection of the debtor's budget in the future, and noting if the presumption is rebutted, a projected budget based upon the evidence, reflecting projected earnings and projected reasonable necessary expenses, will govern the determination of "projected disposable income" for purposes of confirmation of the plan).

[19]*BFP v. Resolution Trust Corp.,* 511 U.S. 531, 537 (1994) (holding Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another); *In re Kibbe,* 2007 WL 512753 at *9 (relying on the "time-honored tenet that '[a]ll words and provisions of a statute are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous'") (citations omitted).

Case 06-41037    Doc# 42-1    Filed 05/15/07    Page 11 of 22

of any change in circumstances.[20]  The courts adopting this reasoning suggest that one must not isolate the word "projected" and inflate its importance, but instead, that the courts' new role is to simply confirm the math on Form B22C and require debtors pay the net number over the proper period of time, without more.

This Court respectfully agrees with the majority of courts, which have found that the term "projected" is a forward-looking concept that not only allows, but requires, this Court to consider at confirmation the debtor's actual income as it is reported on Schedule I (Official Form 6I, revised 10/06), as well as any reasonably anticipated changes in that income during the life of the proposed Chapter 13 plan.[21]  First, Congress' reference in § 1325(b)(1)(B) to *projected* disposable income *to be received* in the applicable commitment period would be superfluous if the historical average was the start and end of the equation.  In fact, Schedule I specifically calls for debtors to provide an "[e]stimate of average or projected monthly income at time case filed," as well as to include estimated

---

[20]*See, e.g., In re Hanks*, __ B.R.__, 2007 WL 60812 (Bankr. D. Utah 2007); *In re Alexander*, 344 B.R. 742 (Bankr. E.D.N.C. 2006) (noting that because Congress was expressly warned of the anomalous result caused by strict use of B22C formula, and nevertheless elected to adopt § 1325(b)(2), this alert, followed by the legislature's nonresponse, supports presumption of legislative awareness and intent); *In re Barr*, 341 B.R. 181, 185 (Bankr. M.D.N.C. 2006) (holding that to arrive at "projected disposable income," one simply takes the calculation mandated by § 1325(b)(2) [using Form B22C] and does the math, finding that the word "projected" is a multiplier for the term "disposable income"); *In re Miller*, __ B.R. __, 2007 WL 128790 at *10 (Bankr. N.D. Ala. 2007) (holding B22C is dispositive of above-median income debtor's income); *In re Trammer*, 355 B.R. 234 (Bankr D. Mont. 2006) (holding that projected disposable income determined by means test is not merely a presumptive number courts can adjust); *In re Kolb*, __ B.R. __, 2007 WL 960135 (Bankr. S.D. Ohio 2007) (acknowledging that many debtors will never be able to propose a confirmable plan given their actual income and expenses, but holding this "is the unfortunate result of a congressionally-created system that uses rigid formulas to calculate a debtor's chapter 13 plan payments rather than considering a debtor's present financial reality and ability to pay.")

[21]The Court agrees with *In re Kibbe*, 2007 WL 512753 that to the extent the definition of "disposable income" contained in § 101(10A)(B) or § 1325(b)(2) excludes certain income (such as Social Security benefits, payments to victims of war crimes, payments to victims of terrorism, certain child support, foster care or disability payments), and those items are reflected on Schedule I, the Court should also exclude those items from Schedule I in determining "projected disposable income," where relevant.  *Id.* at *8.

12

"monthly overtime," and to "[d]escribe any increase or decrease in income reasonably anticipated to occur within the year following the filing of this document."[22]  In other words, Schedule I tries to capture what income debtors actually will have to fund a plan.

Second, as the *Hardacre*[23]court noted, we cannot minimize Congress' insertion of the word "projected" before the words "disposable income" in the Chapter 13 confirmation context.  Third, § 1325(b)(1) requires us to make the determination whether the debtor is committing all of his or her *projected* disposable income "as of the effective date of the plan."  As noted, Schedule I assists courts in determining whether the plan is properly committing all this income, and clearly calls for the Court to consider income to be received during the life of the plan.

Fourth, this Court respectfully suggests that the alternative holding leads to absurd results that are at odds with both congressional purpose and common sense.  The facts in these two cases, of Stephanie Lanning and Jesus Avila, demonstrate this point.  Rigid adherence to the Form B22C formula in these cases, where both Debtors' respective incomes dropped significantly from their pre-petition monthly average, would prevent such debtors from ever being able to file a feasible and confirmable Chapter 13 repayment plan.  This Court agrees with the court in *Kibbe* when it noted that such a

---

[22]Line 17.  The Court assumes the debtor is only asked to "predict" increases and decreases in income for one year as a recognition that it becomes more difficult to accurately predict such changes for later years.  The Court acknowledges that official forms do not trump statutes, *see In re Lenton*, 358 B.R. 651, 657 n. 14 (Bankr. E.D. Pa. 2006) (noting that when an Official Form is in conflict with a federal statute, the statute must control), but the forms do support this interpretation.

[23]*In re Hardacre*, 338 B.R. at 723.

Case 06-41037   Doc# 42-1   Filed 05/15/07   Page 13 of 22

"statutory indifference to the change [in income] at confirmation would doom any chapter 13 plan."[24]

Accordingly, in those cases where the debtor's income at confirmation has not appreciably changed from the historical number contained in Form B22C, Schedule I will contain essentially the same "income" number. In cases like Avila's and Lanning's, however, where a debtor's financial situation has significantly deteriorated over the six months prior to filing, strict adherence to the net results of Form B22C would result in the anomalous situation where those who most need bankruptcy protection would be precluded from seeking it. Experience shows that individuals who lose jobs, or who have a sudden (albeit temporary) reduction in income as a result of a strike, layoff, medical condition for them or a dependent requiring time off work, and the like, are among those who most frequently seek Chapter 13 protection, in an attempt to save homes and cars for which they have failed to make timely payments due to the reduction in income. If these debtors are forced to file quickly after the income reduction (when their "current monthly income" is still above-median as averaged over the prior six months), in an attempt to forestall the repossession of a car, or the foreclosure of a home, they will, as a class, be denied the opportunity to reorganize under Chapter 13.[25]

_____

[24]*In re Kibbe*, 2007 WL 512753 at *10.

[25]They might also be denied relief under Chapter 7, as a presumption of abuse could well arise under § 707(b)(2). They would then have to either convert to Chapter 13 (which would be futile because they could not propose a feasible plan) or dismiss their Chapter 7. Again, the scant legislative history would indicate this was likely not the intent of Congress. *See* 151 Cong. Rec. 2462-02 at S2470, 2005 WL 562943 (March 10, 2005) (statement of Senator Nelson: "It is important to note that no American will be denied access to the bankruptcy system under these reforms.").

14

This Court will not adopt a reading of the statute that results in this absurd result—a result that would effectively preclude Chapter 13 relief for those most in need. Furthermore, the reading of the statute preferred by the minority, which minimizes the importance of the word "projected," similarly results in an absurd result when a debtor's financial picture has appreciably improved since the six-month look back period. The following example demonstrates that situation:

> A debtor takes unpaid family leave for the first two months of the historical six-month look back period required by §101(10A), but then returns to her $6,000 a month job for the remaining four months. She would still be an above-median income debtor, but her Form B22C would only show monthly income of $4,000. The net dividend payable to unsecured creditors, shown on Line 58 of Form B22C, would almost inevitably be considerably less than her actual ability to pay.

Nevertheless, the Court would be required to confirm the plan, even though the debtor was not paying what she was able to pay her unsecured creditors.

Accordingly, this Court follows the *In re Kibbe*[26] line of cases, which hold that the income shown on Form B22C is the appropriate starting point for the Court's inquiry into whether a debtor is in compliance with the "projected disposable income" requirement of § 1325. "The Court will presume that the number resulting from Form B22C is the debtor's "projected disposable income" unless the debtor can show that there has been a substantial change in circumstances such that the numbers contained in Form B22C are not commensurate with a fair projection of the debtor's budget in the future."[27]

---

[26]2007 WL 512753 at *8.

[27]*Jass*, 340 B.R. at 418-19. *See also In re Moore*, ___ B.R. ___, 2007 WL 1111267 (Bankr. D. Kan. 2007).

15

## 2. Expenses

The next issue the Court must decide is whether it should subtract the expenses shown on Form B22C—some of which are formulaic and some of which are "actual," or those shown on Schedule J, which are allegedly "actual"[28] expenses, from the appropriate income number, to determine the dividend that should be paid to unsecured creditors by above-median income debtors under § 1325(b)(1)(B). The plain language of § 1325(b)(3) summarily decides the issue.

That statute requires that "[a]mounts reasonably necessary to be expended under paragraph (2) *shall* be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)."[29] Section 707(b)(2)(A)(ii)(I) -(V) establishes very definitive deductions from income, based on Internal Revenue Service National and Local Standards as well as on some of a debtor's actual monthly expenses for "the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides...."[30] In this statute, Congress expressly contrasted when the standardized (or "applicable") allowance must be used, and when actual expenses were to be used, in determining "disposable income."

---

[28]Judge Berger's experience, outlined in *In re Moore*, dovetails with this Court's experience, when he notes that "...Schedules I and J more often than not are an unrealistic projection of future income and costs of living. Chapter 13 debtors ultimately experience income and expenses widely divergent from their initial projection. Reality is that changes in income and expenses are almost certain to occur over a five-year period. A debtor's failure to present a realistic budget sets him up for a default in plan payments at the outset of his plan. Reliance on Schedules I and J for a true projection of the debtor's future cash flow is illusory at best, even if it is the debtor's best estimate of future income and expenses." *Moore*, 2007 WL 1111267 at *2.

[29]Emphasis added.

[30]*Id.* at § 707(b)(2)(A)(ii)(I), such as health insurance, disability insurance, and health savings account expenses.

16

This demonstrates that Congress clearly understood the difference between actual expenses and "standardized" expenses, and elected to establish a means test formula that used a mix of those two. Accordingly, if the Court were to use Schedule J (which reflects actual expenses in every expense category), in determining which expenses to deduct from income, it would be reading all references to National and Local IRS Standards out of the relevant statutes, which of course it cannot do.[31] This Court finds that above-median income debtors must deduct from income the expenses they itemize on Form B22C to arrive at the minimum amount that they must pay to unsecured creditors, except for limited exceptions not expressly argued here.[32]

## B.    Duration of plan payments

The final issue this Court must decide is whether the plans of Debtors Avila and Lanning can be confirmed in light of the inference or provision in each plan that their plans will not necessarily run a full 60 months. Again, this question is easily answered by the plain meaning of § 1325(b)(1)(B). The Code does not require a set dividend to

---

[31]*See Nutraceutical Corp. v. Von Eschenbach*, 459 F.3d 1033 (10th Cir. 2006) (noting that the rule against surplusage "encourages courts to give meaning to every word used in a statute to recognize congressional intent. In effect, this rule embodies the belief that Congress would not have included superfluous language.").

[32]As noted *In re Hanks*, 2007 WL 60812 at *5, because §1325(b)(3) incorporates § 707(b)(A) and (B), courts do have a very limited ability to adjust both income and expenses under § 707(b)(2)(B)(I) based on a showing of "special circumstances, such as serious medical condition or a call or order to active duty in the Armed Forces ... for which there is no reasonable alternative." Although the Trustee here stipulated that there had been a change in circumstances in each of these cases, for future case, the Court believes the procedure set forth in *In re Jass* is logical, and required by the statute. *Jass* notes that "[t]he inquiry under § 707(b)(2)(B) into whether "special circumstances" exist in a debtor's case is similar to the Court's inquiry into whether a substantial change in circumstances exists. Thus, the Court will look to the analysis required by § 707(b)(2)(B) for guidance in determining whether a debtor has met his or her burden to show a substantial change in circumstances. A debtor attempting to meet this burden should present documentation similar to that required by § 707(b)(2)(B)." *In re Jass*, 340 B.R. at 418.

17

unsecured creditors, only a minimum number of months for debtors to commit their projected disposable income to payment into their Chapter 13 plan.[33]  Neither plan satisfies this requirement.

The Court incorporates its reasoning contained in *In re Pohl*,[34] which decision is being entered at or about the same time as this decision.[35]  As *Pohl* explains, the applicable commitment period for above-median income debtors is 60 months (unless their plan earlier pays unsecured creditors in full), even when the amount on B22C or Schedule I, minus the expenses shown on Form B22C, is a negative number, for several reasons.

First, the language of § 1325(b)(1) and (4) supports a temporal interpretation of "applicable commitment period, because those subsections use words with a temporal meaning, such as "period," "commitment" and "years," and don't use words such as "when multiplied by 12," as is used earlier in the same statute, or "multiplied by 60," as used in § 707(b)(2)(A)(I).  Congress clearly knows how to use a multiplier when it so

---

[33]*See In re Beckerle*, 06-20572 (Bankr. D. Kan. April 13, 2007) (holding language requires a minimum number of years for debtors to commit their projected disposable income - whatever the amount may be), relying on *In re Davis*, 348 B.R. 449, 458 (Bankr. E.D. Mich. 2006).

[34]Case No. 06-41236.  The decision in *Pohl* is being entered at or about the time of this decision.  Debtors Pohl had no income other than social security income; they thus were deemed, pursuant to § 101(10A), to have zero income and were categorized as below-median income debtors.  Nevertheless, this Court held that if they chose to pay into a plan income that is statutorily excludable, in order to propound a feasible plan, they must pay that amount for a full 36 months.

[35]*See also In re Moore*, 2007 WL 1111267 (holding that while § 707(b)(2)(B)(I) gives courts the discretion to consider "special circumstances" relevant to disposable income and expenses, no provision of the Code provides similar discretion regarding calculation of the applicable commitment period; thus an above-median income debtor cannot reduce that period based solely on a post-petition change in income); *In re Grady*, 343 B.R. 747, 749 (Bankr. N.D. Ga. 2006) (finding that fact debtors suffered a post-petition loss of income could not serve to reduce the term of their plan).

18

intends, and chose not to do so in § 1325(b)(4).

Second, a "monetary" or "multiplier" interpretation of "applicable commitment period" is a significant departure from pre-BAPCPA practice, which required a minimum period of payments, that is simply not justified by the language or structure of the statute, or by the admittedly scant legislative history.[36] BAPCPA's revision of § 1325 has not changed this tenet of pre-BAPCPA practice.[37] Third, adoption of the "monetary" or "multiplier" theory would allow debtors to cash out unsecured creditors at a discount at any time, without requiring a debtor make his or her best efforts over some required period of time to repay creditors.

Fourth, a holding that a "monetary" or "multiplier" theory is the correct view would be inconsistent with the Code's future reporting requirements for debtors, such as the obligation to turnover post-confirmation tax returns to the Trustee and to project reasonably anticipated income increases in the 12 months following filing. There would be no need to engage in such reporting if regardless of the information gleaned, debtors could exit their Chapter 13 plan whenever they could pay off secured and priority claims.

Finally, what little legislative history we have supports that Congress believed that requiring debtors to make plan payments for 36-60 months would assist debtors in acquiring the financial discipline they would need to really get a fresh start, post-

---

[36]*In re Schanuth, 342 B.R. 601 (Bankr. W.D. Mo. 2006), citing* House Report, which indicates even the title of the report referenced Chapter 13 plans having a five-year duration in certain cases.

[37]*In re Davis*, 348 B.R. at 455-56 and *In re Schanuth*, 342 B.R. at 607.

19

discharge.  Senator Sessions, one of the proponents of the legislation, stated that

> "[i]f a debtor files under Chapter 13 and learns how to manage money under a
> structured repayment plan that requires some discipline, the debtor learns financial
> responsibility and should be able to avoid future financial turmoil. Chapter 13
> bankruptcies allow debtors to keep their assets and pay back a portion of their
> debts over a 5 year period.  In exchange, the remaining portions of their debt are
> discharged and the debtor gets a fresh start."[38]

To obtain a confirmable plan, both Lanning and Avila will be required to make payments

over 60 months.

## III.    Application to Debtor Lanning

Because Debtor Lanning's Schedule I showed actual income of $1,922, and her

B22C showed expenses of $4,228, the means test would result in Debtor not having to pay

anything to unsecured creditors, because the remainder is a negative number.  If she pays

zero, however, she cannot formulate a feasible plan[39] that meets all the other requirements

of § 1325(a).  Nothing prevents debtors from electing to pay more than the statutory means

test requires, in order to meet the requirement that a plan must be feasible, so long as the

payment continues for 60 months.  Accordingly, since Debtor Lanning has proposed to

pay $144 per month, her plan is confirmable so long as it continues 60 months.

---

[38]151 Cong. Rec. S2462-02 at S2472 -S2473, 2005 WL 562943  (March 10, 2005) (statement of Senator
Sessions).

[39]Section 1325(a)(6).  *See also In re Miller*, 2007 WL 128790 at * 6 (holding that "[f]or any number of reasons,
because a debtor has income not counted in the definition of current monthly income [such as Social Security income],
has housing or transportation expenses less than the permissible IRS deductions, has huge secured debt for luxury items,
that bizarrely, may be deducted in full as a reasonable and necessary expense, or wishes to continue to contribute to or
repay a loan to her 401(k) plan rather than pay her unsecured creditors, a debtor under the new "disposable income" test
may show a zero or negative number, yet may be able to make the required showing that she actually has enough income
to fund a confirmable plan.")

## IV.   Application to Debtor Avila

Similarly, Debtor Avila's Schedule I showed actual income of $5,200 and his B22C showed expenses of $5,531.57, resulting in the finding that nothing need be paid to unsecured creditors.  The Trustee has not objected that Debtor's plan to pay $195 bi-weekly is not feasible, only that his plan must run 60 months.  Accordingly, the Court may well confirm the plan if his heirs wish to proceed, and if the standard confirmation order is modified to require payment for a full 60 months.

## V.   Conclusion

Debtors' plans cannot be confirmed because they allow for the possibility of discharge without making payments over five years, in violation of 11 U.S.C. § 1325(b)(4).  The Court, therefore, sustains the Trustee's objections, but will allow Debtors 30 days (from April 26, 2007, when this basic holding was orally announced at the docket) to file and provide notice of an amended plan that is consistent with this opinion. Alternatively, if Debtors elect to notify the Trustee and the Court that they will allow the standard confirmation order to reflect that each plan will run five years, also by May 26, 2007, they will not be required to file and provide notice of an amended plan.  These cases will be next heard on the Court's May 30, 2007 at 1:30 p.m. confirmation docket.

This decision constitutes the Court's findings of fact and conclusions of law for purposes of Bankruptcy Rule 7052.  A separate order sustaining the Trustee's objections will be entered pursuant to Fed. R. Bank. P. 9021.

21

Case 06-41037   Doc# 42-1   Filed 05/15/07   Page 21 of 22

\# \# \#

22